## BAKER *vs.* MILLS & GIBB *et al.*[*]

SIMMONS, J.—The court below did not abuse its discretion in granting this injunction.

Judgment affirmed. (Head-note by the court.)

May 2, 1888.

[*]No further opinion than the head-notes was filed in this and the remaining cases of this term.

Injunction.　　Before Judge MARSHALL J. CLARKE. Fulton superior court.　　September term, 1887.

Sweetser, Pembrook & Company and Mills & Gibb filed a creditors' bill against J. R. Baker and Benjamin Woolman, partners, lately doing business under the name of Baker & Woolman, alleging, in substance, as follows: They were indebted to complainants over $2,000; the amount was due, and payment had been demanded and refused after maturity. Defendants began business in 1887, with a very small amount of actual capital, and at once began to borrow money and buy on credit, and during the spring and summer contracted very large indebtedness, but had only a small stock. In August, Baker went to New York and purchased more goods. He sought credit of complainants, and in order to ascertain whether or not to sell to him, they asked a statement of the standing of the firm, etc. In order to induce them to extend credit, Baker stated that the firm commenced business April 1, 1887, with $2,500 cash of their own; that both of his firm had several years' experience as clerks in a business similar to that in which they were engaged, and were competent to conduct such business; that they had sold $5,000 worth of goods and had stock on hand of the value of $3,700; that they owed only $300; that their sales were for cash; that they would sell the first year $20,000 worth of goods all for cash; that they were insured for $3,000; that they would not buy above $4,000 worth of goods at that time; that the total expenses of the business and personal expenses of the partners did not amount to more than $2,400 a year; and that complainants would be perfectly safe in selling to them on a credit. Relying on these statements and believing them to be perfectly true, complainants, on the faith of

them, sold goods and extended credit to the firm. Complainants have since learned that the statements were false and fraudulent; that at the time they were made, the firm was indebted $2,000 or more; that their stock of goods, if brought to sale, was not sufficient to pay their indebtedness, and the partners had no property besides; that at that time they were indebted to Woolman's sister $540 principal, to Baker's father $500, to the Atlanta National Bank for borrowed money $500, and to others from $600 to $1,000; that it was not true that Woolman had had several years' experience as a clerk in a like · business; that these facts were known to Baker at the time he made the statements; and that he knew his firm could not and would not pay for the goods and concealed the real facts from the complainants, thereby inducing them to part with their goods, which they would not otherwise have done. A large portion of the goods purchased, to the amount of $1,200 or other large sum, still remained on hand; the remainder have been sold and the proceeds mingled with and used in the business of the firm. Complainants claim that the funds should be traced and the property subjected to their claim, and the remaining property of the firm· held liable therefor.

About November 28, 1887, an attorney for Mills & Gibb called on Baker & Woolman and demanded payment of their account. They acknowledged its correctness and gave him a check for $250, which was paid. On December 21 thereafter, he again called on them and urged payment of the amount still due. They gave him another check for $300 in part payment, Baker informing him that they had money in the bank but not enough to cash the check, but if it were sent to New York, they would, by the time it was returned to Atlanta, have enough in bank to meet it. On this rep-

resentation it was forwarded to New York, but when it was returned to Atlanta it was found that there was no money in bank to pay it, and if there had been any at all when it was given, it had, in the mean-time, been drawn out. At the time each of these checks was given, Mills & Gibb would have proceeded to take legal steps to place the business of the firm (who were traders doing business) in the hands of a receiver, had they not been deceived by the representations and assur-ances of Baker. When the first check was given, Baker stated to the attorney that his firm had a capital of $3,500 and a stock of the value of $7,500, and their whole liabilities were not above $5,200, leaving a net surplus of $5,800; and complainants were thereby mis-led and took no legal steps to enforce their claims, as they would otherwise have done. Immediately after the giving of the second check, and for the purpose of avoiding the filing of a bill against them as insolvent traders, it was announced that the firm had dissolved, and that Baker had bought out Woolman and had as-sumed all indebtedness; although he knew of the giving of the second check and the delay in its presentation. Baker paid Woolman $100 cash and gave him certain notes and obligations, and then took charge of the stock and property of the firm, and is proceeding to sell and control the same as a trader. The goods of com-plainants which remained on hand at the time of the dissolution were taken possession of by Baker, and most of them still so remain. They have been mingled with other goods in the store, making their identifica-tion difficult; and Baker is proceeding to sell at greatly reduced prices, part of the stock at less than cost, and to appropriate the proceeds. Baker & Woolman are insolvent. The true facts as to the misrepresentation made by Baker were not discovered until after the dis-

solution of the firm and the failure to pay the check. There are numerous past due and unpaid debts outstanding against Baker and Woolman, and unless a receiver is appointed, attachments, etc. will be taken out, and a multiplicity of suits will result. Complainants pray for a receiver, for injunction, for a decree setting aside the sales made by them, and that they recover the goods sold by them which remain on hand, and for payment for those disposed of, or, if this cannot be done, that the entire stock be sold by the receiver and they be paid in full; also for *subpœna* and general relief.

A rule *nisi* was issued and a temporary receiver appointed. Other creditors were subsequently made parties to the bill.

On the hearing, Baker moved to dismiss the bill on the grounds:

(1) Because there was no cause of action set forth.

(2) Because complainants had no lien and showed no special reason taking them out of the general rule and entitling them to an extraordinary remedy.

(3) Because the charges of fraud were not sufficiently specific, there being no sufficient charge of defendant's mingling the goods with his own goods, and no charge that such mingling occurred fraudulently.

This motion was overruled. The answer of Baker is substantially covered by his affidavits, which were as follows: Neither of the bills of complainants are due. The bill of Sweetser, Pembrook & Co. was dated October 15th, and the sale was on four months' time; that of Mills & Gibb was dated October 1, and the sale was on the same time. He made no false statements in New York. It was his intention to buy the goods fairly and honestly and to pay for them in the same way. He stated to the representative of complainants that his

firm started with a capital of $2,500; that of this, $2,000 belonged to them and the balance deponent received from his father, who offered it as a gift, but deponent refused and took it as a loan; that this loan was to be for as long a time as he desired, and he was to pay no interest; and that he had for several years been engaged as a clerk in a similar business. He did not state that his partner had such experience; nor did he say they had sold $5,000 worth of goods, but that he thought they had sold from four to five thousand, and he did then think so, though he has since learned that the sales were something less than $4,000; his partner had special charge of the sales, and for this reason deponent was not accurate. He did say they had stock on hand of about $3,700, but does not think he said they owed only $300; what he did say was that they owed about $400 and had a note in bank for $500 and had the money to meet it; he did not say they owed exactly $400 but about $400, which was true. Of the amount due Woolman's sister, $400 was borrowed after deponent's statement, $40 was interest, and $100 was estimated in the amount mentioned by deponent. He stated that they were insured for $3,000, and they were, for that amount or more. He did not state that they would not buy above $4,000 worth of goods, but that he did not expect to buy more than $4,500; and he bought about $3,770. He did not state that the expenses of the business and the personal expenses of the members of his firm did not amount to more than $2,400, but did state that their rent was $1,440, that each partner drew out $50 a month, and that their wives assisted them in the business. He denies that any of his representations were false or fraudulent, or that the indebtedness of the firm was $2,000, or that their stock of goods was not enough to pay their in-

debtedness. He expected to pay when he bought; he still desires to pay, and if permitted will continue the business and use every effort to pay; and he expects to receive assistance from his relatives, which will enable him to buy goods in the spring and pay all he owes in the fall. Of the goods purchased of Sweetser, Pembrook & Co. and Mills & Gibb no very large portion remains on hand, and that remaining is almost impossible to identify because the stock has been mixed; yet if necessary, he can and will tear his stock to pieces and find all on hand. The mixture was for no purpose of concealing or hiding the goods, but was necessary in the ordinary course of business. When he gave the first check to Brown, he stated that the claim was not due, and he gave the check only to avoid trouble and because he was advised by Brown that it was to his interest to do so. He promised Brown to give him another check, but before the time for giving it arrived, he began to fear that the firm would not meet their bills as they matured, and he advised with counsel as to what course of action to take, his purpose being to arrange to pay the bills in full, and he so expressed it. When the time for giving the second check arrived, he was advised by his counsel to state the facts to Brown and give him the check if he desired it; and so he did. He did not state that he had money at the bank, but stated that he did not have money there, and he did not ask for any delay in forwarding the check. He then hoped to be able to pay the check; he intends now to pay it as soon as possible. When deponent conferred with his attorney and partner, the latter feared they could not pull through and desired to effect a settlement; but deponent desired to make no settlement at less than 100 cents on the dollar, and believed he would obtain assistance from his relatives; and as

Woolman was not willing to join him in this plan, the partnership was dissolved, he buying out Woolman. He invoiced his entire stock just before the receiver was appointed, except the goods on the counter, displays, etc., and the invoice made its net value $8,058.30, and he estimated the goods on the counter, etc. at at least $1,000 net invoice cost. He could not duplicate his stock for the sum named, and it is worth to him at least that much. Sweetser, Pembrook & Co. are secured on their claim to the extent of $1,000 by the indorsement of his father and father-in-law, who are amply solvent. The goods he bought of that firm and of Mills & Gibb are always sold on four month's time. This defendant also offered an explanation of the changes made of the book in the account of his father and father-in-law.

The defendant Woolman answered, stating that the partnership was formed about March 1, 1887; that Baker had experience as a clerk, but respondent had not; that in raising capital to put into the business, they borrowed $750 from respondent's sisters, and the firm used it, and Baker knew of its borrowing and use; that it was used in the purchase of goods and has never been repaid; that the firm borrowed $400 in addition from one of his sisters and gave her their note August 27, 1887, and $100 from the other sister and gave her their note May 31, 1887; that these two debts now aggregate $540; that Baker borrowed from his father for the firm $485 in April or May, 1887, and the firm's notes were given for it; that Baker went to New York to purchase goods and was there about August 29th or 30th, 1887; that the firm were then indebted about $2,000, including the debts already mentioned, about $600 for merchandise, and about $300 to $500 to the Atlanta National Bank for borrowed money; that the

indebtedness to the plaintiffs is due and unpaid; that respondent does not know what representations Baker made while in New York; that in December, 1887, the firm being insolvent, respondent desired to make an assignment or other legal arrangement, so that their creditors might share alike; and his negotiations with Baker resulted in his selling out to the latter; that he was induced to make this sale by its being held out to him that Baker would assume all indebtedness of the firm, and respondent would by law be relieved from all liability on account thereof; that he has since learned that such is not the law; that no· inventory of the stock was taken when he made the sale or at any other time; that the dissolution and sale were made December 23, 1887; that Baker gave him $100 in money and his notes for $759.43; that the object was to pay off his sisters with the money and notes; that at the time of and before this sale, the firm and its members were insolvent, and are so still; that respondent has delivered the money and notes received by him to the temporary receiver; that at the time of dissolution the assets of the firm consisted of the stock in the store and about $100 due them; that their indebtedness was between six and seven thousand dollars, part due and part falling due; that a part of the goods purchased of complainants are still in the stock and can be identified in part; and that respondent acted honestly, etc.

On the hearing, this answer was read by complainants and its reading objected to by counsel for Baker, but the objection was overruled. On the material facts of the case the evidence was conflicting.

The court granted the injunction and appointed a receiver, subject to be dissolved by the giving in ten days of a bond in double the value of the goods in the receiver's hands, conditioned for the payment of such

amount as the complainants might recover of the defendant in the case. Defendants counsel insisted that this was not a correct bond in this case; and made the following further assignments of error:

(1) The court erred in granting the temporary order upon an *ex parte* showing, there being no charges in the bill to require or justify such an order.

(2) The court erred in not dismissing the bill on motion of defendant at the hearing, for the reasons given in the motion.

(4) The court erred in not excluding the answer of Woolman.

(5), (8) The court erred in appointing a receiver and granting an injunction.

(6), (9) The court erred in requiring the bond above referred to, and in placing all of the stock in the hands of the receiver.

(7) The court erred in not requiring bond of the complainants, as requested by defendant's counsel.

HOKE & BURTON SMITH, for plaintiff in error.

WALTER R. BROWN and J. H. LUMPKIN, *contra.*